UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| FELICIA M. BAYLES, | ) |
| Plaintiff, | ) |
| v. | ) Case No.: 5:16-cv-00054-JHE |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION[1]

Plaintiff Felicia M. Bayles ("Bayles") seeks review, pursuant to 42 U.S.C. § 405(g), § 205(g) of the Social Security Act, of a final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying her application for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI").[2] (Doc. 1). Bayles timely pursued and exhausted her administrative remedies. This case is therefore ripe for review under 42 U.S.C. §§ 405(g), 1383(c)(3). The undersigned has carefully considered the record and, for the reasons stated below, the Commissioner's decision is **REVERSED** and this action is **REMANDED** for further administrative proceedings.

### I. Factual and Procedural History

Bayles protectively filed applications for a period of disability, DIB, and SSI on June 13, 2012, alleging she became unable to work beginning May 15, 2011. (Tr. 204-215). The Agency

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 14).

[2] The judicial review provisions for a DIB claims, 42 U.S.C. § 405(g), apply to claims for SSI. *See* 42 U.S.C. § 1383(c)(3).

denied her claims initially, and Bayles requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 73, 110-118). Bayles attended the hearing on February 4, 2014, during which the ALJ determined that further medical evidence was needed. (Tr. 50-70). Therefore, on May 20, 2014, Bayles attended a second hearing at which the ALJ received testimony from a medical expert. (Tr. 33-44). After the hearing, the ALJ found that Bayles was not under a disability at any time through the date of the decision. (Tr. 25).

Bayles then requested review of the ALJ's decision by the Appeals Council. (Tr. 6, 8). The Appeals Council denied Bayles's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). Following denial of review by the Appeals Council, Bayles filed a complaint in this court seeking reversal or remand of the Agency's decision. (Doc. 1.)

## II. Standard of Review[3]

The court's review of the Commissioner's decision is narrowly circumscribed. The function of this Court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This Court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

---

[3]In general, the legal standards applied are the same whether a claimant seeks DIB or Supplemental Security Income ("SSI"). However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations for statutes or regulations found in quoted court decisions.

Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

This Court must uphold factual findings supported by substantial evidence. "Substantial evidence may even exist contrary to the findings of the ALJ, and [the reviewing court] may have taken a different view of it as a factfinder. Yet, if there is substantially supportive evidence, the findings cannot be overturned." *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). However, the Court reviews the ALJ's legal conclusions *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

### III. Statutory and Regulatory Framework

To qualify for disability benefits and establish his or her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.[4] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must

---

[4]The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499.

result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The Commissioner must determine in sequence:

    (1)    whether the claimant is currently employed;
    (2)    whether the claimant has a severe impairment;
    (3)    whether the claimant's impairment meets or equals an impairment listed by the [Commissioner];
    (4)    whether the claimant can perform his or her past work; and
    (5)    whether the claimant is capable of performing any work in the national economy.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993) (citing to the formerly applicable C.F.R. section), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 562-63 (7th Cir. 1999); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job." *Pope*, 998 F.2d at 477; *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner must further show such work exists in the national economy in significant numbers. *Id.*

### IV. Findings of the Administrative Law Judge

At Step One, the ALJ concluded that Bayles had not engaged in substantial gainful employment since May 15, 2011, her original alleged onset date.[5] (Tr. 17). At Step Two, the ALJ determined that Bayles suffered from the medically determinable impairments of disc bulge,

---

[5] Prior to her hearing, Bayles amended her alleged onset date to January 16, 2013. (Tr. 52, 231). However, in his decision, the ALJ repeatedly referred to May 15, 2011, as Bayles' alleged onset date.

4

degenerative changes of the lumbar spine, depression, and anxiety. (Tr. 17). The ALJ specifically rejected Bayles' diagnosis of fibromyalgia as an impairment (*id*.), and then concluded that Bayles did not have any severe impairments. (Tr. 20). Because the ALJ found Bayles had no severe impairments, he did not reach Steps Three through Five.[6] Specifically, the ALJ did not consider whether any of Bayles' impairments, alone or in combination, met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; did not determine a residual functional capacity, and did not consider whether any work existed in the national economy Bayles could perform.

**V. Analysis**

Bayles contends the ALJ failed to evaluate her complaints of pain in a manner consistent with the Eleventh Circuit Pain standard. (Doc. 10 at 4). Additionally, she asserts the ALJ's decision finding that she does not suffer from any severe impairment is "irrational and [] not supported by substantial evidence." (*Id*. at 5). Having reviewed the record, the court finds insufficient evidence to support the ALJ's determination that Bayles has no severe impairments. The Commissioner's decision will be reversed and remand for further proceedings.

At her first hearing, Bayles testified she was fifty-five years old and had completed the tenth grade.[7] (Tr. 51). She was asked what was her "worst problem," to which she responded "I

---

[6] The regulations state: "[I]f you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience." 20 C.F.R. § 404.1520(c); 20 C.F.R. § 416.920(c). "An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1521(a); 20 C.F.R. § 416.921(a).

[7] At the first hearing, Bayes' counsel suggested Bayles might meet Grid rules 201.01,

hurt 24/7." (Tr. 55). She explained her back hurts, her right leg stays numb, and she has pinched nerves. (*Id.*). Bayles described pain radiating from her back into her right hip and leg. (Tr. 56). Additionally, Bayles explained her pain from fibromyalgia was qualitatively different than from pain in her back, with the former causing a burning, stinging, "the nerve endings . . . constantly like they're on fire," and painful skin and muscles, while the latter is "very intense." (Tr. 57). She further stated she was in pain sitting in the hearing and that she could only sit or stand for less than thirty minutes each. (Tr. 56, 59). Moreover, Bayles listed a minimal range of housework she could perform without assistance. (Tr. 60-61). She testified about her problems with anxiety and depression. (Tr. 63, 65). Also at the first hearing, a vocational expert testified that Bayles' prior work was in the light to medium and unskilled to semiskilled range. (Tr. 69-70).

At the second hearing, a medical expert ("ME"), who had reviewed Bayles' medical records, noted Bayles had physical pain all over, but normal reflexes and a reasonable range of motion. (Tr. 35). He further noted that the long-term treatment plan for Bayles was "pretty heavy doses of oxycontin," which was "not a good strategy" in his opinion. (Tr. 35). The ME stated he did not believe any objective basis for any physical limitations existed. (Tr. 35). The ME acknowledged the February 2012 MRI, which reflected a broad-based disc protrusion at L5 S1, but opined that "a lot of them will resolve after a year has gone by" so Bayles should not have any limitations from this. (Tr. 36). In contrast, the VE testified that a doctor's recommendation that Bayles should avoid manipulation of the lumbar spine, avoid excessive extension and flexion, get massages, rest and apply heat for fifteen to twenty minutes every two to four hours would preclude all employment. (Tr. 44).

---

201.02, 202.04 or 202.06. (Tr. 52).

The medical records reflect that in October 2011, Bayles' treating physician referred her to a rheumatologist for a consultation due to her chronic joint pain.[8]  (Tr. 297, 304).  Dr. Robert Hunt noted that all of Bayles' muscles were 1+ tender, she described symptoms which sounded like dysautonomia,[9] and in combination with Bayles' myofascial pain "certainly suggests the possibility of fibromyalgia subset characterized by all of the above."[10]  (Tr. 300).  Bayles has also been followed by Dr. Usha Nuthi, a neurologist, since November 2011.  (Tr. 367).  As noted by the ALJ, in January 2012, Bayles reported "I feel GREAT!" (Tr. 363).  However, the March 2012 record reflects Bayles was crying due to back pain and had been seen in the emergency room for the increased pain, radiating to her right leg.  (Tr. 361, 434, 437).  In May, Bayles complained of increased back leg pain.  (Tr. 359).  In June and July 2012, she reported no change in pain, but stated she had to take more Lortab than what was prescribed for relief.[11]  (Tr. 357, 450).  In June

---

[8] Dr. William Myers, Bayles' treating physician, also referred her to the Alabama Pain Clinic, but Bayles could not afford the $868.00 initial visit fee.  (Tr. 305).

[9] The Mayo Clinic describes dysautonomia as follows:

> Autonomic nerve disorders (dysautonomia) refer to disorders of autonomic nervous system (ANS) function. Dysautonomia is a general term used to describe a breakdown or abnormal function of the ANS. The autonomic nervous system controls much of your involuntary functions. Symptoms are wide-ranging and can include problems with the regulation of heart rate, blood pressure, body temperature, perspiration, and bowel and bladder functions. Other symptoms include fatigue, lightheadedness, feeling faint or passing out (syncope), weakness, and cognitive impairment.

http://www.mayo.edu/research/departments-divisions/department-neurology/programs/autonomic-nerve-disorders

[10] As Dr. Hunt is a rheumatologist, the record contradicts the ALJ's determination that Bayles "has not been seen by a rheumatologist."  (Tr. 22).

[11] The record also contradicts the ALJ's finding that Bayles stated in her June 5, 2012 visit that she was feeling great and that her depression and muscle spasm had improved.  (Tr. 18).  Moreover, while the ALJ found Bayles made similar comments in her March 27, 2011 visit,

Dr. Nuthi noted Bayles had a swollen leg, but Bayles reported her fibromyalgia was stable, and her depression and muscle spasms were improved. (Tr. 357). Dr. Nuthi also noted Bayles' reported that her symptoms worsen with activities of daily living, and recorded that her symptoms were severe and appeared to be worsening. (Tr. 357). From March through July 2012, Bayles was noted to have body aches, chronic myofascial pain, depression, fatigue, joint pain (multiple sites) leg cramps, loss of balance, morning stiffness in her joints, muscle spasms, numbness in her upper and lower extremities, radiating pain, reduced exercise tolerance, shoulder cramps, and sleep disturbances. (Tr. 357, 361, 450). Straight leg raise was positive, but Bayles' reflexes and strength were normal. (*Id*.). Dr. Nuthi repeatedly diagnosed Bayles with fibromyalgia and low back pain. (*Id*.). Her recommendations included cancelling unnecessary activities, avoiding manipulation of the lumbar spine, avoiding excessive extension and flexion of the spine, getting massages, and using heat on the affected areas for fifteen to twenty minutes at a time, every two to four hours. (Tr. 358, 451).

An MRI on April 27, 2012, revealed at L4-5 disc desiccation and annular bulge, without herniation, plus mild facet joint degenerative changes with joint effusions, at L5-S1 found a broad central disc protrusion coupled with mild facet joint hypertrophic degenerative change narrowing the lateral recesses and appearing to impinge on the right S1 nerve root; an extruded fragment extending inferior to the interspace level and into the right 5-1 foramen, producing moderate foraminal narrowing; and noted a possible slight flattening of the right L5 root. (Tr. 369).

---

Dr. Nuthi's records reflect Bayles's first visit to her was November 22, 2011. (Tr. 367). While Bayles was seen on March 27, 2012, those records reflect Bayles was crying due to her lower back pain (tr. 361), which is not consistent with reporting she felt great. Finally, on December 20, 2011, the other date on which the ALJ incorrectly finds Bayles reported she felt great, Dr. Nuthi's records reflect Bayles reported her depression as improved and her fibromyalgia as improving, but noted Bayles's complaints of continued pain. (Tr. 365).

In August 2012, Dr. Myers noted Bayles suffers from chronic pain. (Tr. 387). Upon mental consultative examination in September 2012, John Haney, Ph.D., believed Bayles suffered from major depressive disorder, recurrent and moderate; anxiety disorder with panic features; and pain disorder. (Tr. 372). Dr. Haney opined that Bayles's functioning in most jobs would be moderately to severely impaired due to physical, emotional, and vocational limitations. (Tr. 372). The ALJ assigned "little weight" to Dr. Haney's opinion on the basis that Bayles received treatment for depression and anxiety through a neurologist or general practitioner, rather than a psychiatrist or psychologist. (Tr. 23). Also in September 2012, physical consultative examiner Dr. Marlin Gill offered no opinion as to Bayles's ability to engage in work related activities, but did observe that Bayles had a normal gait, could get on and off and exam table unassisted, had full range of motion, and normal muscle strength. (Tr. 375). Bayles complained of pain in her back but could squat and walk on her toes. (Tr. 375). Dr. Gill diagnosed Bayles with low back pain and fibromyalgia. (Tr. 376). The ALJ failed to assign any weight to Dr. Gill's opinion.

In September 2012, Bayles complained to Dr. Nuthi of her fibromyalgia "acting up." (Tr. 454). The following month, Bayles reported greater fatigue and pain, so Dr. Nuthi increased Bayles's prescription for Cymbalta to try to better manage the fibromyalgia symptoms. (Tr. 457). November 2012 records note Bayles complained it hurt to walk and her low back pain had increased to a severe intensity. (Tr. 459-460). She asked for stronger pain medication. (Tr. 459). Dr. Nuthi commented that Bayles's symptoms appeared to be worsening. (Tr. 460). In February 2013, Bayles was in a car wreck. (Tr. 503). A CT of her cervical spine at that time found degenerative changes, a reversal of the normal lordotic curve, and osteophyte formation at C5/C6. (Tr. 507). Dr. Nuthi again noted a worsening of Bayles's fibromyalgia. (Tr. 468).

In March 2013, Bayles reported her fibromyalgia symptoms were stable, but in April 2013,

9

Bayles yet again reported worsening symptoms and increased pain and depression. (Tr. 471-475). In April through June 2013, Dr. Nuthi recommended Bayles engage in regular, low impact exercise three times a week, one to two times a day for twenty to forty minutes at a time and use cold or hot packs as needed. (Tr. 476, 479, 482). The August 2013 record reflects that Bayles's gait was abnormal, and her list of problems expanded to include pain in limb, low back pain, cervicalgia, other acquired torsion dystonia, multiple sclerosis NOS, and fibromyalgia. (Tr. 484). The ALJ failed to assign any weight as to the opinion of Dr. Nuthi.

At the beginning of 2014, Bayles was seen by Dr. Melanie Gardner. (Tr. 492). Bayles complained of back pain, muscle pain and right side leg weakness/numbness. (Tr. 493). She was also noted to be anxious and fearful. (Tr. 493). Her gait was noted to be slow and cautious. (Tr. 493). Bayles was diagnosed with fibromyalgia, back pain, anxiety, and depression. (Tr. 494). The ALJ failed to assign any weight to the opinion of Dr. Gardner.

Bayles has also been followed at a pain clinic since March 2014, where she receives oxycodone for pain. (Tr. 511). She was noted to walk bent forward, but with good balance and strength in her legs. (Tr. 512). Her first two drug screens were positive for substances other than oxycodone, she was warned about self-medicating, and her subsequent screens were clear. (Tr. 522-524).

The record contradicts the ALJ's determination that Bayles' medically diagnosed impairments are not severe, and the substantial evidence directs the exact opposite conclusion. The overwhelming weight of the evidence supports a finding that Bayles's impairments would cause "more than minimal" limitations. *See e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986) ("An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work,

10

irrespective of age, education or work experience. Claimant need show only that her impairment is not so slight and its effect is not so minimal.").

To reach his conclusion, the ALJ relied on Dr. Haynes, the ME at the hearing, to the exclusion of all other evidence and medical opinions in the record. Dr. Haynes testified (1) Bayles had no neurological deficits, (2) Bayles' "long term plan was a hefty dose of Hydrocodone; (3) the broad based disc protrusion should repair itself; and (4) MRI findings require correlation with physical findings for support, which were lacking here. (Tr. 21). The ALJ then found Bayles' statements concerning the severity of her pain to be non-credible because she tested positive for THC in March 2014. (Tr. 22). As stated above, the ALJ's conclusion that Bayles has not been seen by a rheumatologist (tr. 22) is refuted by the rheumatologist's records. Moreover, Bayles' doctor's decision to treat her diagnosed medical problems with medication is not equivalent, as stated by the ALJ, to Bayles's "only long-term plan . . . to increase her medication" and that this somehow "negates the severity of the claimant's condition."[12] (Tr. 22).

Compounding the ALJ's errors was his insistence that Bayles exhibited no objective evidence of fibromyalgia. Specifically, he stated that Bayles produced evidence of an underlying medical condition, but no objective evidence of the severity of the pain. (Tr. 22). However, in considering claims of disability based on fibromyalgia, the Eleventh Circuit has specifically ruled that "[b]ecause the impairment's hallmark is thus a lack of objective evidence, we reversed an ALJ's determination that a fibromyalgia claimant's testimony was incredible based on the lack of objective evidence documenting the impairment." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th

---

[12] This statement is both unsupported and illogical. Bayles has not made a unilateral decision to increase various medications she has been prescribed. Rather, the doctors whose care she is under have made this decision because of Bayles' level of pain. The increased dosages of medications prescribed by her doctors actually support the level of severity Bayles alleged.

Cir. 2005) (citing *Stewart v. Apfel*, 245 F.3d 793 (11th Cir. 2000) (unpublished)). *See also Todd v. Heckler,* 736 F.2d 641, 642 (11th Cir. 1984) (explaining that pain alone may be disabling and that it is improper for an ALJ to require objective medical evidence to support a claim of disabling pain); *Robinson v. Astrue*, 365 Fed.App'x 993, 997 (11th Cir. 2010) ("The ALJ cannot discredit testimony as to the intensity or persistence of pain and fatigue solely based on the lack of objective medical evidence."). Under facts quite similar to those presented to the ALJ here, the Eleventh Circuit ruled

> We also find unpersuasive the ALJ's only other stated reason for discounting Dr. Barakat's RFC, namely, that the limitations imposed therein "are based primarily upon [Somogy's] subjective complaints" . . . We, along with several other courts, have recognized that fibromyalgia "often lacks medical or laboratory signs, and is generally diagnosed mostly on an individual's described symptoms," and that the "hallmark" of fibromyalgia is therefore "a lack of objective evidence." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam); *see also Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 243 (6th Cir. 2007) (stating that "fibromyalgia patients present no objectively alarming signs"); *Green–Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (explaining that "there are no objective tests which can conclusively confirm [fibromyalgia]" (quotation marks and citation omitted)); *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) (noting that "[t]here are no laboratory tests for the presence or severity of fibromyalgia") . . . . Given the nature of fibromyalgia, a claimant's subjective complaints of pain are often the only means of determining the severity of a patient's condition and the functional limitations caused thereby. *See [Green-Younger*, 335 F.3d] at 107. In this case, the record shows that Somogy consistently reported symptoms of fibromyalgia, including, *inter alia*, chronic muscle pain, severe fatigue, pain upon palpation of tender points, insomnia, jaw pain/tenderness, numbness in the legs and feet, dizziness, and depression, both before and after diagnosis, and that Somogy's physicians consistently noted and credited these complaints. Other than a lack of objective medical findings, there is nothing in the record to suggest that Somogy did not suffer the degree of pain she reported or that her doctors should have disbelieved her complaints. *See, e.g., Rose v. Shalala*, 34 F.3d 13, 18 (1st Cir. 1994) (ALJ's finding that claimant's fatigue did not significantly affect his RFC was not supported by substantial evidence where "examining physicians' reports, over a period of more than 18 months, consistently noted (and credited) claimant's complaints of persistent fatigue" and the record contained no "meaningful evidence to support a finding that claimant did not suffer from a significant level of fatigue on a regular basis"). As we have already explained, however, "the nature of fibromyalgia itself renders . . . over-emphasis upon objective findings

12

> inappropriate." *Rogers*, 486 F.3d at 248; *see also Green–Younger*, 335 F.3d at 108–09 (lack of physical abnormalities did not undercut claimant's complaints of pain since physical examinations of fibromyalgia patients "will usually yield normal results"). Rather, the credibility of Somogy's complaints of disabling pain are bolstered by evidence that she made numerous visits to her doctors over the course of several years, underwent numerous diagnostic tests, and was prescribed numerous medications. *See Rogers*, 486 F.3d at 248 (ALJ erred in discrediting claimant's complaints of pain where ALJ "focus[ed] on purely objective evidence" and failed "to discuss or consider the lengthy and frequent course of medical treatment or the nature and extent of that treatment, the numerous medications Rogers has been prescribed, the reasons for which they were prescribed, or the side effects Rogers testified she experiences from those medications") . . . .

*Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 63–65 (11th Cir. 2010). Under this guidance, the ALJ's rejection of at least four separate medical doctors' diagnosis of fibromyalgia, given the level of care they provided, is unsupported by the record and thus erroneous.

In consideration of the foregoing, the Commissioner's decision will be reversed and remanded for further proceedings, because the opinion of the ALJ is not supported by substantial evidence, and the ALJ failed to apply the proper legal standards in his consideration of the evidence, including consideration of whether the Medical-Vocational guidelines require a finding of "disabled" if Bayles is limited to light or sedentary work. The ALJ should reconsider and reweigh all of the evidence in the record upon remand.

## VI. Conclusion

For the reasons set forth above, the Commissioner's decision is **REVERSED**, and this action **REMANDED** for further proceedings consistent with this Memorandum Opinion.

A separate order will be entered.

DONE this 30th day of March, 2017.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE